Exhibit 1

# Community Meeting Minutes

## Oakland Inner Harbor Tidal Canal

*3 February 2005*

---

A Community meeting hosted by the U.S. Army Corps of Engineers and the City of Alameda was held on 3 February at the Edison School, 2700 Buena Vista Avenue, in Alameda. The purpose of the meeting was to express a united interest in resolving encroachment issues, permit and licensing issues, and the eventual divesting of the property by the Federal Government.

Bill Norton, City Manager of Alameda, started the meeting by welcoming everyone and thanking them for attending. He emphasized that the City was looking for positive solutions to the ongoing problem of homeowners having structures on Federally owned land and the issue of compliance with the Corps' permitting and licensing requirements along with BCDC's and the City's requirements. He acknowledged the lack of diligent management by the City and the Corps and the obvious confusion about how homeowners could obtain necessary permits and licenses. He said they are looking to having a single point of contact to handle this issue.

Lieutenant Colonel (LTC) Feir, U.S. Army Corps of Engineers, then spoke about working with the City to manage the Oakland Inner Harbor Tidal Canal ("OIHTC"). He introduced Corps staff persons Jason Tarasek, Office of Counsel, Al Paniccia, Project Manager, and Susan Miller, Planner/Real Estate liaison, and Barbara Price of PK Consultants. He described the history of Alameda, that it used to be a peninsula and how the Government acquired the private lands through eminent domain to dredge the canal. He further discussed how this made the Corps owner and manager of the property and that the federal government has contemplated divesting the property for nearly a century. Feir said that now is the time for the Government to divest itself of this property; the environmental clean-up of the property is the Corps' responsibility, and a preliminary clean-up investigation is now underway.

LTC Feir also said the Corps-imposed moratorium is designed to temporarily disallow construction in the OIHTC until the Corps conceives a way to better manage the OIHTC.

Tarasek offered an overview of the OIHTC project, describing the significance of bulkhead and pierhead lines. He explained that the federal government currently owns property upland of the pierhead lines along both sides of the canal, and that the canal is two miles long. He mentioned that the Corps is also negotiating with Oakland regarding a potential property transfer. He pointed out that the Federal ownership could be impacting the residents' backyards and that the Federal Government would like to get away from this property ownership role. He stressed that, although the land transfer is not imminent, the Corps would soon tighten its management of the OIHTC until a transfer could take place. He also reviewed the required steps to legally use "docks" on Federal property by: (1) obtaining a lease or license to access the Federal land; (2) obtaining a regulatory permit to build a "dock" in the water per the Clean Water Act and the Rivers and Harbors Act; (3) obtaining a permit from BCDC to place "fill" in the waters; and (4) obtaining permits from the City of Alameda to comply with building and zoning codes.

Tarasek also discussed the Shoreline Management Plan (SMP) that is currently being drafted by his office. This document would govern the construction, maintenance and use of permissible structures. He pointed out that few abutting landowners have gone through the cumbersome process of obtaining all the required permits from the various agencies. Because the Corps – as property owner – could potentially be liable for accidents or injuries on its land, the Corps called a "time-out" until it could figure out how to tackle the issue; hence the moratorium.

He stated that the Corps is currently conducting a Phase I environmental clean-up investigation and that the results look good so far. Next, he said, the Corps would inventory OIHTC structures. Once the moratorium is lifted, residents would need to obtain necessary permits for existing and proposed structures. Potentially, the Corps would grant a five-year "amnesty" period to allow abutting property owners time to get their structures into compliance with all of the regulatory agencies.

He stated that the overall goal is to implement a Shoreline Management Plan, get everyone into compliance, get clean-up done, and then divest the property.

Questions and Answers: (Corps answer unless otherwise indicated)

Q: Who maintains the bulkhead?
A: This is likely a case-by-case determination. In some instances, it would be the abutting property owner; in others, the Corps.

Q: Whom does the property get divested to?
A: Still working this aspect out. The most likely possibility is that the Corps will divest its ownership to the cities of Alameda and Oakland, respectively.

Q: Does the easement/permit/license transfer with the land?
A: Although a real-estate license is non-transferable, the Corps hopes that the City of Alameda will continue to honor the guidelines of the Shoreline Management Plan even after the Corps transfers ownership to the City. Regulatory permits contain a provision to allow transfer under certain circumstances. Most permits are for a single construction event – therefore if a permitted structure has not been completed at the time a property is sold, the permit may be accepted by the new owner, by signing in the appropriate block and then completing the project before the permit expires.

Q: Is the goal to have the property deeded to the property owner?
A: (City answer) Yes. This is, of course, ultimately a decision for the City Council. This is still under negotiation; we want your ideas.

Q: Has any thought been given to shoreline access?
A: (City answer) The City has invited BCDC to address this question.

Q: Is your main concern the liability of ownership?
A: Yes. Owning property is not among the Corps' missions. Divesting excess property ownership is, therefore, our top priority.

Q: Why not sell the property to the abutting landowners?
A: This is a possibility but it is not as easy an option for the Corps as is transferring one parcel to the City of Alameda.

Q: In the fourth slide what is the 400 ft measurement?
A: From the Bulkhead line on the Alameda side to the Bulkhead line on the Oakland side.

Q: Equal enforcement of the laws/codes upon all properties? (Will the hoops I jumped through be imposed upon everyone?)
A: (City Answer) We are not seeking to penalize people, which would normally equate to a 4-times permit fee. Our emphasis will be on gaining compliance through voluntary means.

Q: Will the shoal by Diamond Creek be dredged?
A: Unknown at this time.

Q: Will we be allowed to make repairs to existing structures?
A: The current moratorium has a safety-repair exception assuming the permit applicant can demonstrate that such repairs are immediately necessary.

Q: Who is responsible for clean up on city property, next to 3341 Fernside?
A: (City) Will investigate.

Q: Is there a draft of the shoreline management plan available to the public?
A: No draft plan available, it is still in the "brainstorming" stage.

Q: If we are in 100% compliance can the city consider a joint escrow?
A: Not a bad idea; we will investigate.

Q/Comment: Would the waterway remain accessible – maybe through an easement?
A: Noted.

Q: In the case of emergency repairs, will the Corps consider pictures as adequate if repairs are made prior to permits being applied for or granted?
A: In some cases, yes. Ideally, a permit applicant should submit a complete permit package. See this website for details (http://www.spn.usace.army.mil/regulatory/).

Q/Comment: Provide a scenario or typical example of the structures that would be approved or would meet the "grandfather" requirements.
A: This is impossible until we finish the Shoreline Management Plan.

Q: Will structures need to be brought to today's standards?
A: The City said that if there are recognizable safety hazards, then things may have to be redone to current codes. Further, the City would look at the codes in effect when the structures were built and try to apply those.

Q: Can you resurvey the property lines and provide the owners with "squatter's rights"?
A: The Federal Government cannot give away property, it is illegal. Second, "squatters' rights" are ineffective against the Government.

Q: Can we make improvements to our property under the Shoreline Management Plan?
A: That is the goal.

Q/Comment: Clarification over property divestment. Like to see it transferred to the property owners.
A: Noted.

Q: Will the city charge a fee for the property once obtained?
A: (City) That would be an issue for the City Council. Generally speaking, we would be legally prohibited from "gifting" public lands.

Q/Comment: Worried about the increase in taxes as many are on a fixed income.
A: Noted.

Q/Comment: Should hold another meeting on purchasing the property because nobody is interested in renting the property.
A: Noted.

Q: Is there a reason to keep the moratorium in place currently?
A: Yes, for safety and uniformity reasons that the SMP will resolve.

Q: Can new property owners replace previously decrepit structures?
A: Not under the moratorium, but under the SMP there will potentially be a mechanism to accomplish this.

Q/Comment: Even after transfer people will still have dealings with BCDC and the City.
A: Yes, and any activity in waters of the U.S. still requires the applicant to obtain a Corps' Regulatory permit whether the property is owned by the Corps, the City or an individual.

Q: Does the moratorium include dredging by private parties?
A: Technically, no. Any party seeking to conduct such dredging must obtain necessary permits.

Q: If we have a moratorium on building then why are they building on the Oakland side (referring to UC Berkeley Boathead)?
A: The Corps mistakenly approved a permit despite the moratorium. The Corps regrets its error.

Q: How big is the area that might be leased or sold to the adjacent owners?
A: It would potentially run from the bulkhead to the pierhead line.

Q: Do my property lines currently extend to the pierhead lines or beyond?
A: No.

Q: Where can I get a copy of the big map (referring to an aerial display posted on the wall)?
A: Because of the format the map is currently unavailable, however, you may request a map from the Corps via PK Consultants (510) 633-9550.

Q: When will somebody enforce the Clean Water Act on the Oakland side?
A: The Corps is aware of the issue but cannot currently comment on this matter.

END