# In the United States Court of Federal Claims

**No. 05-1179L**
**FILED: November 7, 2006**

| | |
|---|---|
| **RITA MOHLEN and RICHARD SKRINDE,** Plaintiffs, | |
| v. | **Motion to Dismiss; Regulatory Taking.** |
| **UNITED STATES,** Defendant. | |

**LAURENCE F. PADWAY**, Alameda, California, for the plaintiffs.

**MARK T. ROMLEY**, Trial Attorney; **SUE ELLEN WOOLDRIDGE**, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

For the purposes of this motion to dismiss filed by the defendant, the facts in the complaint are taken as true. However, in this case, the material facts are not in dispute. Defendant United States owns the Oakland Inner Harbor Tidal Canal (the Canal) in Alameda County, California. Plaintiffs Rita Mohlen and Richard Skrinde, a married couple, owned residential property adjacent to the Canal at 3017 Marina Drive, Alameda, CA 94501. Plaintiffs sold their interest in the property in September, 2005. Plaintiffs' former pier, boathouse, boat hoist and floating dock are located in the Canal. The owners of the residence at 3017 Marina Drive prior to plaintiffs built the boathouse, pier, and dock. The structures include an enclosed office space, a rooftop deck, a deck with a hot tub and permanent boat-hoist equipment, and a dock that extends thirty-one feet beyond the pierhead line.

Nationwide, Regional, and Individual Permits

In order to build or maintain a structure on United States navigable waters, property owners are required to obtain a permit from the Department of the Army Corps of Engineers (Corps). See 33 U.S.C. § 403 (2000); 33 C.F.R. Parts 322, 325, 330 (2004). Under the Rivers and Harbor Act of 1899, citizens are prohibited from creating any obstruction to United States navigable waters, building a pier or other structure outside established harbor lines in any United States canal or other water, and altering the course, location, or capacity of any canal or other water unless authorized by the Secretary of the Army. 33 U.S.C. § 403. Federal regulations issued pursuant to the statute authorize the Corps to issue permits to citizens wishing to maintain or build in navigable waters on a nationwide, regional, or individual basis. 33 C.F.R. Parts 322, 325, 330. Section 330.1 describes the Purpose and Policy of Nationwide Permits (NWP) as follows:

> (b) *Nationwide permits*. Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts. The NWPs are proposed, issued, modified, reissued (extended), and revoked from time to time after an opportunity for public notice and comment. Proposed NWPs or modifications to or reissuance of existing NWPs will be adopted only after the Corps gives notice and allows the public an opportunity to comment on and request a public hearing regarding the proposals. The Corps will give full consideration to all comments received prior to reaching a final decision.

33 C.F.R. § 330.1(b) (2004).

The rules direct that when citizens in a geographic area propose building or maintenance activities that are "substantially similar in nature and cause only minimal individual and cumulative environmental impacts," the Corps may issue a general nationwide or regional permit for those activities. 33 C.F.R. § 322.2(f)(1); see also 33 C.F.R. §§ 322.3(a) & 330.1(b)-(d). When a general (nationwide or regional) permit is inappropriate, a citizen may apply for an individual permit, which the Corps may issue after case-by-case evaluation of a specific structure and a determination that the proposed structure is in the public interest. See 33 C.F.R. § 322.2(e), Part 325. Even if the Corps originally issues a citizen an NWP, "[i]f the DE [District Engineer] finds that the proposed activity would have more than minimal individual or cumulative net adverse effects on the environment or otherwise may be contrary to the public interest, he shall modify the NWP authorization to reduce or eliminate those adverse effects, or he shall instruct the prospective permittee to apply for a regional general permit or an individual permit." 33 C.F.R. § 330.1(d); see also 33 C.F.R. §§ 330.4(e) & 330.5.

Real Estate Licenses

The Secretary of the Army (Secretary) may lease or license a particular use of government property subject to Army control when the Secretary determines that such a use is "convenient and advantageous" to the United States. See 10 U.S.C. §§ 2667-2668; 32 C.F.R. § 643.3. In the current case, plaintiffs also were required to obtain a separate

Real Estate License from the Corps to build or maintain their structures in the Canal because the structures sit between the United States Pierhead/Bulkhead Line and the United States Channel Line, which is property owned by the federal government. See 10 U.S.C. §§ 2667-2668; 32 C.F.R. §§ 643.71-.74.

Real Estate License Issuance

During or shortly before the year 2000, plaintiffs sought to repair and improve the boathouse, pier, and dock built by the prior owners of the 3017 Marina Drive property, after the Corps discovered eighty-eight building code violations on the waterfront structures. On October 13, 2000, the Corps issued Real Estate License No. DACWO5-3-00-603 to Ms. Mohlen "to maintain and repair an existing floating dock" on plaintiffs' property in the Canal "as identified in Exhibit A [drawing of Ms. Mohlen's property]." The Corps granted Ms. Mohlen the license for a five-year period, subject to various conditions including that the license was (1) "revocable at will by the Secretary [of the Army]," (2) "personal to the grantee, and this license, or any interest therein, may not be transferred or assigned," and (3) "subject to regulatory requirements from Federal, state, and local agencies having jurisdiction within the Oakland Inner Harbor Tidal Canal." On September 16, 2003, the Corps approved Ms. Mohlen's request to amend her license to replace Exhibit A with Exhibit B, a drawing reflecting proposed changes to plaintiffs' property, including an extension of plaintiffs' dock.

Nationwide Permit Issuance

On June 20, 2002, the Corps granted Ms. Mohlen a Nationwide Permit 3(i), Maintenance to engage in specific repairs on the condition that the repairs were made in accordance with the drawings Ms. Mohlen submitted in her NWP application package and in accordance with the terms of Ms. Mohlen's Real Estate License No. DACW05-3-00-603, dated October 13, 2000. The June 20, 2002 letter from the Corps issued the NWP in response to plaintiffs' April 10 and May 17, 2002 applications requesting the Corps' "authorization to make recommended safety issue repairs to a residential dock on Corps property in the Oakland Inner Harbor Tidal Canal." The Corps' letter noted that "[n]on-compliance with any condition could result in the revocation, suspension or modification of the authorization for your project, thereby requiring you to obtain an individual permit from the Corps." The NWP authorization was for a fixed term of two years ending June 20, 2004, and subject to modification, suspension, or revocation. Moreover, the permit was subject to certification or waiver from the San Francisco Bay Regional Water Quality Control Board and concurrence from the San Francisco Bay Conservation and Development Commission and with certification of compliance with California's Coastal Zone Management Act.

Nationwide Permit Suspension and Revocation

On May 6, 2004, the Corps sent a letter to Ms. Mohlen suspending her NWP. The Corps explained that it based its revocation in part on the construction plan amendments

that plaintiffs had submitted to her Real Estate License. The Corps reminded Ms. Mohlen that the Corps "considers a repair to a structure on Federal property within the OIHTC [Oakland Inner Harbor Tidal Canal] to be restricted to a one-for-one replacement of a currently serviceable . . . structure such that it does not change the footprint, purpose or location of that structure," that the NWP "allows only '[m]inor deviations in the structure's configuration or filled area,'" and that plaintiffs' revised plans appeared "not to be a repair, but rather the complete reconfiguration of the current dock increasing its footprint significantly" (from thirty-one feet beyond the pierhead line to forty-five feet).

On August 19, 2004, the Corps sent a letter to plaintiffs' counsel and Ms. Mohlen reflecting the Corps' previous suspension of the NWP and notifying plaintiffs of the Corps' decision to revoke the NWP. The August 19, 2004 letter from the Corps referred to its May, 2004 suspension of Ms. Mohlen's "permit authorization to repair a residential dock behind their residence at 3017 Marina Drive" and a July, 2004 meeting with Ms. Mohlen's husband, Richard Skrinde, and his attorney "to discuss the suspension of the permit authorization." The Corps' letter then informed plaintiffs of the Corps' decision to revoke Ms. Mohlen's NWP. The letter stated, in part:

> Now, in consideration of the factors enumerated in 33 C.F.R. section 330.5(d) (2004) "Issuing, modifying, suspending, or revoking nationwide permits and authorizations," the District hereby **<u>revokes</u>** its previous permit authorization.
>
> The District Engineer is required to conduct a public interest review in evaluating all permit applications pursuant to 33 C.F.R. section 320.4(a) (2004). The public interest review is based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Among the factors, the District Engineer has evaluated issues related to economics, land use, navigation and the environment. As such, the balance of interests weighs in favor of revoking the permit.
>
> In view of the fact that we have new information on several of the factors relevant to the public interest review including, but not limited to, cumulative impacts, we are required to revisit our previous decisions regarding the verification that Mr. Skrinde's activity would qualify for a Nationwide Permit (NWP) 3.

(emphasis in original).

The Corps listed the various public interest factors it had considered prior to finding that the public interest "outweigh[ed] Mr. Skrinde's personal interest in expanding the size of his dock several dozen feet into the Canal." The Corps found:

> Most significantly in this regard, it is clear that Mr. Skrinde's proposed project exceeds the parameters of NWP 3, titled "Maintenance." Rather than a "[m]inor deviation [ ] in [a] structure's configuration," the proposed project would result in the complete reconfiguration of the current dock resulting in a significant increase in the dock's footprint.

(brackets in original).

The Corps also found "significant" that Mr. Skrinde was not in compliance "with the terms of his real-estate license (DACW05-3-00-603)" because his residence "carries numerous California building code violations." Further, the Corps indicated that "the cumulative impacts" of plaintiffs' construction plans were "greater than originally contemplated," and noted that the San Francisco District's recent moratorium on new construction was implemented to "allow time for the District to work collaboratively with other resource agencies in crafting a Waterfront Management Plan that would also satisfy the long-term planning objectives of the cities of Oakland and Alameda." Moreover, the Corps found that the "interest of ensuring navigation safety . . . weighed against Mr. Skrinde's plan" since his "current dock already extends much further into the Canal than virtually every other dock on the Alameda side of the Canal," and "[t]he proposed plan would have added significantly to the size of this aberration." Last, the Corps cited a neighboring property owner's complaint "that construction of Mr. Skrinde's proposed dock would impede access to his [own] dock." The Corps' letter closed: "Despite the revocation of our previous permit authorization, the District invites Mr. Skrinde to apply for a permit that adheres to the moratorium on new construction."

Without an NWP or another Corps permit, plaintiffs' further dock maintenance or construction was prohibited, as evidenced by the Corps' September, 2004 "cease and desist" letter to plaintiffs following the Corps' discoveries on August 17 and 27, 2004 that plaintiffs had engaged in unauthorized work on the dock. The cease and desist letter noted the Corps' authority to require removal of illegal structures "when such removal is considered appropriate," but informed plaintiffs that the Office of Counsel recommended no such legal action at that time and ordered plaintiffs to apply for an after-the-fact authorization of their dock reconstruction work within fifteen calendar days from the date of the receipt of the letter. There is no indication in the record before the court that plaintiffs applied for such authorization.

Plaintiffs claim that the NWP revocation[1] caused them a loss of approximately $300,000.00 by impairing the value of the real property located at 3017 Marina Drive, and of the adjacent dock, boat house, boat hoist and related structures. According to plaintiffs, their claim for the $300,000.00 loss "represent[s] the difference in value of the property with and without the license [permit]" when they sold their real property interest in September, 2005.

[1] Although the complaint alleges that the "defendant revoked the . . . license," plaintiffs' counsel acknowledges in his "Memorandum in Opposition to Motion to Dismiss" that "[b]y inconsequential drafting error, the complaint refers to revocation of the license when it should have referred to the revocation of the nationwide permit for this property only." Plaintiffs' counsel confirmed at oral argument that the government's revocation of the permit is the exclusive action that plaintiffs allege took their property interest.

## DISCUSSION

The defendant filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), alleging that this court lacks subject matter jurisdiction and that plaintiffs failed to state a takings claim. As noted above, for the purposes of the defendant's motion to dismiss, the material facts of this case are not in dispute and this court will view the facts in the light most favorable to the plaintiffs.

Failure to State a Claim

The defendant argues in its motion to dismiss that plaintiffs have failed to state a takings claim because plaintiffs do not have a cognizable property interest in the NWP and, in any event, the government's actions did not amount to a taking. The plaintiffs argue that the United States has taken their property without just compensation, in violation of the Fifth Amendment to the United States Constitution. The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Fla. Rock Indus., Inc. v. United States, 45 Fed. Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871).

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00 that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267(1946)); see also Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Takings Clause in the Fifth Amendment, the plaintiffs must show that the government took their private property for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 126 S. Ct. 330 (2005). A takings claim requires a two-step analysis in which a court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. The question of whether plaintiffs owned a compensable property interest presents "a question of law based on factual underpinnings." Walcek v. United States, 303 F.3d 1349, 1354 (Fed. Cir.) (citing Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied sub nom. E. Minerals Int'l, Inc. v. United States, 535 U.S. 1077 (2002)), reh'g and reh'g en banc denied (2002). Therefore, to succeed, a takings plaintiff must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001); Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1580 (Fed. Cir.), reh'g denied (1993). Then, if the plaintiff does possess a property interest, the court decides if the governmental action at issue constituted a taking of that property. See Wyatt v. United States, 271 F.3d at 1099-1100; Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Karuk Tribe of Cal. v. Ammon, 209 F.3d at 1374.

If a plaintiff has a valid property interest, the government "takes" that interest by destroying, physically occupying, or excessively regulating it for a public purpose. Boyle v. United States, 200 F.3d 1369, 1374 (Fed. Cir. 2000). Furthermore, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." Brown v. Legal Found. of Wash., 538 U.S. 216, 233 (2003) (quoting Tahoe Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-23 (2002)) (citations omitted). Consistent with this notion, the United States Supreme Court has noted that most takings cases fall within two distinct classes:

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

Yee v. City of Escondido, Cal., 503 U.S. 519, 522-23 (1992) (citations omitted); accord Abrahim-Youri v. United States, 139 F.3d 1462, 1465 (Fed. Cir. 1997) (physical takings are "based on an outright governmental seizure or occupation of private property," while regulatory takings are "based on a regulatory imposition that constrains an owner's continuing use of property"), cert. denied sub nom. Gurney v. United States, 524 U.S. 951,

reh'g denied, 524 U.S. 970 (1998).

Property Interest

The threshold issue in this takings claim is whether plaintiffs had a cognizable property interest, either in the NWP[2] or in the improvements plaintiffs made on the government property. Plaintiffs may not claim a Fifth Amendment taking without alleging a valid property interest at the time of the taking. Wyatt v. United States, 271 F.3d at 1096. In the case currently before the court, as discussed below, plaintiffs cannot establish a cognizable property interest to support their takings claim.

In plaintiffs' opposition to defendant's motion to dismiss, plaintiffs cite a California state court case, Noronha v. Stewart, to claim that their Real Estate License constitutes an easement under California law based on language in the case, which states: "where a party has made substantial expenditures in reliance on a license, the license acts, for all purposes, as an easement, estopping the grantor and his successor from revoking it." Noronha v. Stewart, 199 Cal. App. 3d 485, 490 (1988). As noted, the only government action complained of by the plaintiffs in the case before this court is the government's revocation of the NWP maintenance permit (not the Real Estate License). Moreover, the regulations establishing the NWP program and the correspondence granting plaintiffs the NWP make clear that the NWP was temporary and revocable at the discretion of the Corps. 33 C.F.R. § 330.1(d).

Plaintiffs further contend that a document signed by the Assistant Secretary of the War Department in 1913 granted them a property interest in the right to build and maintain structures on the government property.[3] The 1913 War Department authorization states,

---

[2] Although the plaintiffs and their attorney have acknowledged that the dispute in this case involves the Nationwide Permit, and not the Real Estate License, the court notes that Ms. Mohlen's license also is not a candidate for creating a property interest. On its face, the license was limited to a five year term, was "revocable at will by the Secretary [of the Army]," was "subject to the right of the United States to improve, use or maintain the premises," and was "personal to the grantee" and "may not be transferred or assigned." The license even required the grantee to pay the government for any expense of restoring the government property to its pre-license state, including the removal of any improvements. Therefore, as the Real Estate License was subject to revocation at will, was not exclusive, and was not transferable, it did not grant Ms. Mohlen a property interest. See infra for discussion of permits not creating property interests in American Pelagic Fishing Company v. United States, 379 F.3d 1363, 1374 (Fed. Cir. 2004), cert. denied, 125 S. Ct. 2963 (2005), and Conti v. United States, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003).

[3] Plaintiffs did not allege a property interest based on the 1913 War Department authorization in their complaint, nor in their initial response brief to the defendant's motion

in its entirety:

> The owners of property abutting the lands included in the right of way acquired by the United States for the Oakland Tidal Canal, shown on accompanying sheet No. 5 are hereby authorized and permitted to occupy with open work non-permanent structures for wharf purposes, the portions of the strips of U.S. property fronting their respective properties and situated between pierhead and bulkhead lines approved June 20th, 1913, without special lease or charges of any kind, it being expressly understood that this permission is revocable at any time when this area may be acquired for purposes of navigation and shall not be construed as a relinquishment of the government title to the said right of way.

The document in the record is dated June 3, 1913, is signed by Henry M. Breckinridge, Assistant Secretary of War, and is titled "Indorsement upon 'Maps of San Francisco Bay showing harbor lines prepared by The San Francisco Harbor Line Board 1912' and approved Jan. 20th, 1915." Defendant argues that this 1913 document is no longer in effect and, therefore, plaintiffs cannot allege a property interest in any rights they claim the document conveys. According to a 1935 War Department submission to Congress, the 1913 document had granted certain permissions for owners of land abutting the government canal property to use the area "25 feet channelward of the bulkhead lines." See War Department, Submission of Reports to Congress (Nov. 26, 1935). Defendant argues that governmental actions in 1929 to merge the pierhead and bulkhead lines negated permissions granted by the 1913 document.

Although the government did not provide documentation of this pierhead/bulkhead line merger, the court need not rule on the validity of the 1913 document, or use permissions issued pursuant to the 1913 document. However, even if the 1913 document remains in effect, it does not convey the type of interest plaintiffs claim it does. The 1913 War Department document only granted property owners permission to use "non-permanent structures for wharf purposes" in the Oakland Tidal Canal "revocable at any time" and to "not be construed as a relinquishment of the government title to the said right of way." Plaintiffs' hot tub, roof deck, enclosed office, and heavy-duty boat hoist far exceed what a reasonable person could consider to be either non-permanent or for wharfing purposes.[4] Since the 1913 document's authorization only extended to non-permanent structures, any reliance on the NWP to create a right to maintain and build permanent structures on government property would be unreasonable, and does not grant plaintiffs an easement property right. Second, the permission is, on the face of the document, subject to revocation at any time. If plaintiffs challenge the propriety of the government's reasons for revoking their permission to build and maintain structures on government property, the plaintiffs may not seek relief in the form of a regulatory takings claim. These

---

to dismiss. Plaintiffs' first reference to the 1913 document is found in a supplemental declaration and attachment thereto opposing the defendant's motion to dismiss.

[4] The definition of wharf is limited to a "structure on the shores of navigable waters, to which a vessel can be brought for loading or unloading." BLACKS LAW DICTIONARY 1626 (8th Ed. 2004).

deficiencies may explain why plaintiffs did not rely on the 1913 document in their complaint, and only belatedly mentioned it in a supplemental filing.

A permit or license, such as the NWP and Real Estate License in the case before this court, does not rise to the level of a compensable property interest for purposes of a Fifth Amendment takings analysis. See Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1374 (Fed. Cir. 2004) (fishing permit does not grant compensable property interest), cert. denied, 125 S. Ct. 2963 (2005); Alves v. United States, 133 F.3d 1454, 1457 (Fed. Cir. 1998) (federal grazing permit does not grant a cognizable property interest for Fifth Amendment purposes); see also Klump v. United States, 50 Fed. Cl. 268, 270 (2001), aff'd, 30 Fed. Appx. 958, 962 (Fed. Cir. 2002).

The government compares plaintiffs' claim to a property interest in the NWP to the permit in American Pelagic. In American Pelagic, the government revoked fishing permits obtained by a vessel after opposition developed to the large vessel's plans to fish in the permitted area. Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1368-69. As a result of the revocation, American Pelagic argued that it was unable to perform profitable work and went bankrupt. Id. The vessel's owner based a takings claim on property interests in the permit to fish and in the physical vessel. Id. at 1369. Although the trial court had found a taking, the United States Court of Appeals for the Federal Circuit found that the government's revocation of fishing licenses did not effect a Fifth Amendment taking because the plaintiff had no property interest in an authorization that (1) was not transferable or assignable;[5] (2) did not confer exclusive fishing privileges; and (3) was granted by the government and revocable at the government's discretion. Id. at 1373 ("Licenses or permits are traditionally treated as not protected by the Takings Clause because they are created by the government and can be cancelled by the government and normally are not transferrable."); see also Conti v. United States, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002) (non-assignable, non-exclusive, revocable fishing permit "bestowed a revocable license, instead of a property right"), cert. denied, 537 U.S. 1112 (2003).

Plaintiffs attempt to distinguish American Pelagic and Conti by arguing that "none of the cases cited by defendant involve real estate. Rather, they concern fishing permits issued pursuant to a statute which specifically provided that the permits were revocable" (emphasis in original). The argument advanced by the plaintffs in the case before this court, however, bolsters the analogy between their case and American Pelagic and Conti because, looking to the nature of the rights granted, plaintiff Mohlen's NWP also was issued pursuant to a regulatory scheme that specifically provided that the permits were revocable.

---

[5] Under the permitting regulations, American Pelagic could not transfer its permit to a future purchaser of the vessel. Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1373 (citing 50 C.F.R. § 648.4(k)). Instead of claiming that the permit was transferable, the plaintiff in American Pelagic asserted that "future owners of the same vessel could apply for the same permits held by American Pelagic, and if they qualified, the permit numbers would stay the same and remain with the vessel." Id. at 1374 n.14.

See 33 C.F.R. § 330.1(d) ("District and division engineers have been delegated a discretionary authority to suspend, modify, or revoke authorizations under an NWP."); see also 33 C.F.R. § 330.5(d). In fact, the applicable regulation states that "NWPs do not grant any property rights or exclusive privileges." 33 C.F.R. § 330.4(b)(3). Further, the NWP was not assignable because it was to be "accomplished as outlined" in plaintiffs' Real Estate License and the Real Estate License expressly prohibited transfer or assignment of the license. As plaintiffs' NWP permit was subject to discretionary revocation and was neither exclusive nor transferable, the permit lacked the indicia of a traditional property right, much like the permits at issue in American Pelagic and Conti.

As to the actual improvements on the government land, plaintiffs rely on Norman v. United States for the proposition that "[a]ll real estate property interests are cognizable under the Fifth Amendment." Norman v. United States, 63 Fed. Cl. 231, 245 (2004) (internal citations ommitted), aff'd, 429 F.3d 1081 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2288 (2006). However, Norman involved a plaintiff's fee simple ownership in land, whereas here the plaintiffs claim a property interest in improvements on government land, where the improvements were necessarily temporary because they were always subject to government revocation of permission approving their existence.

Defendant also argues that plaintiffs have no compensable interest and their claim of a $300,000.00 loss is foreclosed by the United States Supreme Court case of United States v. Fuller, 409 U.S. 488 (1973). In Fuller, the Supreme Court held "that the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands." Id. at 493. The Supreme Court cited the "general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created, or that it might have destroyed under the exercise of governmental authority other than the power of eminent domain." Id. at 492. Defendant properly asserts that "[a]ccordingly, Defendant 'need not compensate' Plaintiffs because it has done nothing more than 'remove by revocation' value that flowed to the Marina Drive property from the real estate license that allowed Plaintiffs to use the government's land."

Takings Claim

Furthermore, even if plaintiffs' structures on the government property were deemed to be a cognizable property interest, which is not the case, and plaintiffs knew that their structures were encroaching on government property, no taking would have occurred. Plaintiffs assert that the government action denied plaintiffs "the right to maintain and repair their property," and in so doing made "the structures illegal and require[d] their removal and destruction. The revocation of the right to maintain and repair the real property destroys completely its economic value to the owner." Plaintiff argues that the government's action "revoking the permit to maintain, repair and improve the structures owned by Ms. Mohlen and Mr. Skrinde . . . essentially destroyed the structures, and thereby condemned them. The government must pay, therefore, for the market value of the structures which it took."

Government regulatory actions, however, only constitute a taking when they interfere with a plaintiff's "reasonable investment-backed expectations." Ruckelshaus v. Monsanto Co., 467 U.S. at 1005. The reasonable investment-backed expectation requirement "limit[s] takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed. Cir.) (citing Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602 (1993); Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211 (1986); Ruckelshaus v. Monsanto Co., 467 U.S. at 1005-06), reh'g and reh'g en banc denied (1994); see also Creppel v. United States, 41 F.3d 627, 632 (Fed. Cir. 1994). "A plaintiff entering a private agreement with knowledge of possible restrictions on property hardly can be said to have been denied a reasonable expectation when those restrictions materialize." Turntable Fishery & Moorage Corp. v. United States, 52 Fed. Cl. 256, 261 (2002) (citing Loveladies Harbor, Inc. v. United States, 28 F.3d at 1177).

In the pleadings before the court, plaintiffs have made no allegations that they were unaware of the government's ownership of the Canal and the related licensing and permitting requirements when they purchased their property at 3017 Marina Drive. In fact, Mr. Skrinde appears to acknowledge that when he and Ms. Mohlen purchased the property in 1994, they were aware of the requirements to obtain local, state, and national permits to bring the waterfront structures on the property up to local building codes. Plaintiffs have not alleged that government regulatory actions interfered with any reasonable investment-backed expectations and, therefore, plaintiffs have failed to state a claim for a regulatory taking.

The government also cites to Turntable Fishery & Moorage Corp. v. United States to argue that the NWP only provided plaintiffs' the right (1) to remove their improvements from government land at any time and certainly at the expiration or termination of the permit, or (2) to receive payment from the government if the government instead had chosen to keep and use the plaintiffs' improvements. Turntable Fishery & Moorage Corp. v. United States, 52 Fed. Cl. at 260. In Turntable, the court based its finding that the plaintiffs had a property interest in improvements on government property on the permit's language stating that the government "would pay plaintiff Turntable for buildings and improvements 'in the event public interest requires public ownership thereof.'" Id. The Turntable court held that even when the plaintiffs enjoyed a property interest in their improvements, the plaintiffs never "enjoyed the unfettered right to maintain that property on federal land," and the only government action that could possibly constitute a taking after the expiration of the permits would occur if the government refused to allow plaintiffs to remove their improvements and took over the property for public use. Id. at 262. In contrast, Ms. Mohlen's Real Estate License indicates that, in the event that the government requires her to remove the improvements, "the property shall either become the property of the United States without compensation therefor, or said officer may cause the property to be removed and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal."

In the pleadings before this court, the plaintiffs have not alleged that the government stood in the way of any right the plaintiffs had to remove their improvements. Upon revoking Ms. Mohlen's NWP, the government encouraged plaintiffs to reapply for a permit based on plaintiffs' original maintenance plans (instead of plaintiffs' new expansion plans, included in the Real Estate License amendment), as follows: "Despite the revocation of our previous permit authorization, the District invites Mr. Skrinde to apply for a permit that adheres to the moratorium on new construction." Defendant notes that, "[c]onsistent with the Corps-imposed moratorium, Plaintiffs could have . . . reapplied for a permit that allowed them to maintain or repair the existing structures in-place and without any expansion." There is no indication in the record before the court that plaintiffs made any applications attempting to preserve and maintain the then existing facilities' footprint, nor do plaintiffs allege that they submitted such an application. In fact, plaintiffs have acknowledged that they did not file the permit application, although invited to do so by the Corps. During oral argument in this court, the following exchange took place:

> THE COURT: The government action that revoked the permit certainly indicated that there was still an option to apply for a revised form of a permit. The Plaintiffs apparently -- and I think there's no disagreement here -- did not do that, is that correct?
>
> MR. ROMLEY [defendant's counsel]: That's my understanding, Your Honor.
>
> THE COURT: Mr. Padway?
>
> MR. PADWAY [plaintiffs' counsel]: That's correct.

Further, the government did not require plaintiffs to destroy the improvements, and its cease and desist letter informed plaintiffs of its intention to refrain from legal action requiring removal. In sum, the plaintiffs have not alleged that the government's action in revoking the NWP interfered with any reasonable investment-backed expectations. The plaintiff also has not alleged that the government has taken action against the structural improvements in any way that the court could categorize as a taking. The plaintiffs, therefore, have failed to state a regulatory takings claim.

<u>Subject Matter Jurisdiction</u>

The defendant also argues in its motion to dismiss that this court lacks subject matter jurisdiction to the extent that plaintiffs allege that the government's actions were illegal, tortious, or in violation of the plaintiffs' constitutional rights to equal protection and due process of the law.

For those allegations in plaintiffs' complaint which sound in tort, the Tucker Act expressly excludes such claims from the jurisdiction of the United States Court of Federal Claims. 28 U.S.C. § 1491(a)(1) (1994); <u>see</u> <u>Keene Corp. v. United States</u>, 508 U.S. 200, 214 (1993); <u>Alves v. United States</u>, 133 F.3d at 1459; <u>Brown v. United States</u>, 105 F.3d 621, 623 (Fed. Cir.), <u>reh'g</u> <u>denied</u> (1997); <u>Golden Pacific Bancorp. v. United States</u>, 15 F.3d 1066, 1070 n.8 (Fed. Cir.), <u>cert.</u> <u>denied</u>, 513 U.S. 961 (1994); <u>Agee v. United States</u>, 72

Fed. Cl. 284, 290 (2006); Zhengxing v. United States, 71 Fed. Cl. 732, 739 (2006); D.F.K. Enters., Inc. v. United States, 45 Fed. Cl. 280, 284 (1999).

In reviewing the jurisdiction of this court, the United States Court of Appeals for the Federal Circuit has stated:

> It is well settled that the United States Court of Federal Claims lacks -- and its predecessor the United States Claims Court lacked -- jurisdiction to entertain tort claims. The Tucker Act expressly provides that the "United States Court of Federal Claims shall have jurisdiction . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1988) (emphasis added), as amended by Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506; see Aetna Cas. & Sur. Co. v. United States, 655 F.2d 1047, 1059 (Ct. Cl. 1981).

Shearin v. United States, 992 F.2d 1195, 1197 (Fed. Cir. 1993).

Further, not every claim involving, or invoking, the United States Constitution necessarily confers jurisdiction on this court. Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1009 (Ct. Cl. 1967). In United States v. Testan, 424 U.S. 392 (1976), the United States Supreme Court stated:

> Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim--whether it be the constitution, a statute, or a regulation--does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis "in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." Eastport S.S. Corp. v. United States, 372 F.2d at 1008, 1009.

Id. at 401-02.

This court, therefore, only can render judgment for money when the violation of a constitutional provision, statute, or regulation independently mandates payment of money damages by the United States. Khan v. United States, 201 F. 3d 1375, 1377-78 (Fed. Cir. 2000). Allegations concerning violation of the Due Process clauses of the Fifth and Fourteenth Amendments and the Equal Protection clause of the Fourteenth Amendment cannot be interpreted to require the payment of money for their alleged violation, and, therefore, they do not provide an independent basis for jurisdiction in this Court. See LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995); see also Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997); Collins v. United States, 67 F.3d 284, 288 (Fed. Cir.) (citing additional cases), reh'g denied (1995); Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987). The court, however, does have jurisdiction over claims under the takings clause of the Fifth Amendment. Elkins v. United States, 229 Ct. Cl. 607 (1981) ("We have held that, except for the taking clause of the fifth amendment, the other amendments do not require the United States to pay money for their alleged violation.").

Furthermore, a takings case assumes that "the underlying governmental action was lawful, and [the court] decide[s] only whether the governmental action in question constituted a taking for which compensation must be paid." Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (on petition for rehearing); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[The] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act."); Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 905 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987); see also John Corp. v. City of Houston, 214 F.3d 573, 579 n.9 (5th Cir. 2000) (citing cases for the proposition that "the Takings Clause presupposes legitimate government action").

Plaintiffs concede that "Defendant retained limited discretion to suspend, revoke or modify the nationwide permit which allowed Ms. Mohlen to maintain and improve her structures" (emphasis in original). However, plaintiffs claim that the government based its revocation on retaliatory and "illegal" motives. Plaintiffs assert, among other claims, that "defendant has selectively engaged in a moratorium on permit and license applications with respect to the Oakland Inner Harbor Tidal Canal . . . depriving affected homeowners of the full use and enjoyment of their property and denying them equal protection under law."[6] While defendant contests this allegation, the debate is not relevant to this court's decision. It is established law that

> an uncompensated taking and an unlawful government action constitute "two separate wrongs [that] give rise to two separate causes of action" and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims.

---

[6] Plaintiffs repeatedly characterize the government's actions and regulations as illegal, violative of the 1913 Grant, or causing unequal treatment. For example, in paragraph 6 of the the plaintiffs' Complaint: "The revocation of the license was motivated by a decision to support illegal efforts by the City of Alameda to retaliate against plaintiffs for the exercise of their constitutionally protected rights." On page 5 of Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss: "[D]efendant did not revoke the permit for the property in issue here for one of these laudatory purposes." On page 6 of Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss: "[Plaintiffs'] due process and equal protection arguments defeat the potential defense that defendant had discretion to revoke the nationwide permit." On pages 5 and 7 of Plaintiffs' Supplemental Brief in Opposition to Defendant's Motion to Dismiss: "[T]he government has no basis to revoke the permit," and "the permit at issue was revoked when there was no acquisition of the property for purposes of navigation, but rather, as alleged in the complaint, the revocation was for an improper purpose." At oral argument, plaintiffs' counsel stated that "the easement is revocable, but only on a certain condition, which doesn't exist" and "we're not conceding the legitimacy of the government's [actions]."

Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir.) (quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1364 (Fed. Cir. 1998)), reh'g denied, 270 F.3d 1347 (2001), cert. denied, 536 U.S. 958 (2002).

Plaintiffs' complaints about the alleged unfairness and "illegality" of the Corps' actions are not properly presented as part of a takings claim in this court. For the purposes of a Fifth Amendment claim under the Takings Clause, the court must presume the government conduct at issue in this case to be lawful. Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001) (on petition for rehearing). To the extent that plaintiffs allege a tort or a violation of their Equal Protection or Due Process rights, this court lacks jurisdiction to hear their claims.[7]

## CONCLUSION

For the foregoing reasons, defendant's motions to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted are, hereby, **GRANTED**. The clerk's office shall **DISMISS** the complaint, with prejudice.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

[7] Because plaintiffs have failed to state a takings claim and the court lacks jurisdiction to the extent that the plaintiffs allege that the government committed a tort against them or violated their constitutional guarantees of equal protection and due process of the law, the issue raised by the defendant of whether Mr. Skrinde has standing in this lawsuit is moot.